JAMES & ASSOCIATES
BECKY S. JAMES (Bar No. CA 151419)
Email: bjames@jamesaa.com
11999 San Vicente Blvd., Suite 240
Los Angeles, CA 90049
Tel: (310) 492-5104
Fax: (310) 492-5026

Attorneys for *Petitioner*
**YONGDA HARRIS**

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | | |
|---|---|---|
| YONGDA HARRIS, | ) | Case No. 16-cv-05606-CAS |
| Petitioner, | ) | SUPPLEMENTAL MEMORANDUM OF |
| | ) | POINTS AND AUTHORITIES IN |
| v. | ) | SUPPORT OF MOTION TO VACATE, |
| | ) | SET ASIDE OR CORRECT SENTENCE |
| UNITED STATES OF AMERICA, | ) | UNDER 28 U.S.C. § 2255 |
| | ) | |
| Respondent. | ) | **Court:**   Hon. Christina A. Snyder |

/ / / /

/ / / /

/ / / /

/ / / /

# TABLE OF CONTENTS

**Page**

I.  Introduction ................................................................................................ 1

II.  Factual and Procedural Background ........................................................... 2

III.  Argument ................................................................................................... 10

A.  Legal Standard ..................................................................................... 10

B.  Mr. Harris Was Deprived of Due Process and Various Constitutional Rights Due to His Misadvisement and Involuntary Guilty Plea ............................................... 10

1.  Mr. Harris's Guilty Plea Was Involuntary and Unsupported by a Sufficient Factual Basis in Light of the Failure to Advise Him of the Essential Element of § 1001 that He Know that His Statements Were Unlawful ................ 10

2.  Mr. Harris's Guilty Plea Was Involuntary for the Additional Reasons that He Was Coerced and Was in a Compromised Mental State .................................. 14

C.  Mr. Harris's Conviction Should Also Be Reversed Due to the Ineffective Assistance of Counsel ........................................... 15

1.  Counsel's Ineffective Assistance in the Plea Process Deprived Mr. Harris of His Rights Under the Sixth Amendment ........................................... 16

a.  Mr. Harris's Counsel Failed to Adequately Advise Him of the Charged Offense ........................................... 16

b.  Mr. Harris's Counsel Did Not Seek Pre-Trial Release or Properly Advise Mr. Harris of His Options for Pre-Trial Release .................................... 17

2.  Mr. Harris's Motion Establishes that His Counsel Operated Under a Conflict of Interest, Abandoning Their Duty of Loyalty and Violating Client Confidentiality ........................................... 18

D.  The Government's Misconduct Also Requires Vacating Mr. Harris's Conviction ........................................... 19

IV.  Conclusion and Requested Relief ............................................................. 21

i

# TABLE OF AUTHORITIES

Page

**Federal Cases**

*Ajoku v. United States*,
   134 S. Ct. 1872 (2014) ........................................................... 12

*Boykin v. Alabama*,
   395 U.S. 238 (1969) ................................................................ 1

*Bryan v. United States*,
   524 U.S. 184 (1998) .............................................................. 12

*Carter v. McCarthy*,
   806 F.2d 1373 (9th Cir. 1986) ................................................. 1

*Cuyler v. Sullivan*,
   446 U.S. 335 (1980) ........................................................ 15, 18

*Frazer v. United States*,
   18 F.3d 778 (9th Cir. 1994) ................................................... 18

*Griffith v. Kentucky*,
   479 U.S. 314 (1987) .............................................................. 12

*Henderson v. Morgan*,
   426 U.S. 637 (1976) .............................................................. 11

*Hill v. Lockhart*,
   474 U.S. 52 (1985) ................................................................ 16

*Johnson v. United States*,
   520 U.S. 461 (1997) .............................................................. 12

*Kirby v. Illinois*,
   406 U.S. 682 (1972) .............................................................. 15

*McCarthy v. United States*,
   394 U.S. 459 (1969) .............................................................. 11

*Mempa v. Rhay*,
   389 U.S. 128 (1967) .............................................................. 15

*Morris v. Slappy*,
   461 U.S. 1 (1983) .................................................................. 18

*Murphy v. Florida*,
   421 U.S. 794 (1975) .............................................................. 21

ii

# TABLE OF AUTHORITIES

Page

**Federal Cases**

*Sanders v. Ratelle*,
  21 F.3d 1446 (9th Cir. 1994) ................................................................. 16

*Strickland v. Washington*,
  466 U.S. 668 (1984) ............................................................................... 16

*United States v. Ajoku*,
  484 Fed. Appx. 824 (9th Cir. 2014) (unpublished) .............................. 12

*United States v. Ajoku*,
  718 F.3d 882 (9th Cir. 2013) ................................................................. 11

*United States v. Ant*,
  882 F.2d 1389 (9th Cir. 1989) ............................................................... 15

*United States v. Barron*,
  172 F.3d 1153 (9th Cir. 1999) ............................................................... 11

*United States v. Grewal*,
  825 F.2d 220 (9th Cir. 1987) ................................................................. 10

*United States v. Heuer*,
  4 F.3d 723 (9th Cir. 1993) ..................................................................... 11

*United States v. Jeronimo*,
  398 F.3d 1149 (9th Cir. 2005) ............................................................... 17

*United States v. Leonti*,
  326 F.3d 1111 (9th Cir. 2003) ................................................... 10, 15, 16

*United States v. Minore*,
  292 F.3d 1109 (9th Cr. 2002) ................................................................ 11

*United States v. Pena*,
  314 F.3d 1152 (9th Cir. 2003) ............................................................... 11

*United States v. Portillo-Cano*,
  192 F.3d 1246 (9th Cir. 1999) ............................................................... 11

*United States v. Rivera-Ramirez*,
  715 F.2d 453 (9th Cir. 1983) ................................................................. 10

*United States v. Schaflander*,
  743 F.2d 714 (9th Cir. 1984) ................................................................. 10

iii

# TABLE OF AUTHORITIES

Page

**Federal Cases**

*United States v. Sitton*,
968 F.2d 947 (9th Cir. 1992) ............................................................. 13, 17

*United States v. Timmreck*,
441 U.S. 780 (1979) ....................................................................... 10, 19

*United States v. Villalobos*,
333 F.3d 1070 (9th Cir. 2003) .............................................................. 11

*United States v. Vonn*,
535 U.S. 55 (2002) ......................................................................... 10, 19

*United States v. Wade*,
388 U.S. 218 (1967) ............................................................................ 16

*United States v. Yamashiro*,
788 F.3d 1231 (9th Cir. 2015) ............................................................. 16

**Federal Statutes**

18 U.S.C. § 1001 ........................................................................... 1, 2, 17

28 U.S.C. § 2255 .............................................................................. 1, 10

28 U.S.C. § 636(b)(1)(A) ....................................................................... 17

**Federal Rules**

Fed. R. Civ. P. 72 ................................................................................. 17

**Local Rules**

L.R. 72-2.1 .......................................................................................... 17

**SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES**

### I.     Introduction

"Constitutional protections of due process mandate that an accused's guilty plea be voluntary and intelligent." *Carter v. McCarthy*, 806 F.2d 1373, 1375 (9th Cir. 1986) (quoting *Boykin v. Alabama*, 395 U.S. 238, 242 (1969)). "Because a guilty plea waives the rights against self-incrimination, to trial by jury, and to confront one's accusers, its acceptance requires the 'utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence.'" *Id.* (quoting *Boykin*, 395 U.S. at 243-44). Unfortunately for Petitioner Yongda Harris, he stands convicted of a crime to which his guilty plea entry was neither voluntary nor intelligent, and he is now serving an illegal sentence. Seeking to correct this manifest injustice, Mr. Harris appearing *pro se* filed his motion to vacate, set aside or correct his sentence under 28 U.S.C. § 2255 on July 27, 2016 ("Motion"). Having now been appointed counsel, Mr. Harris now submits this supplemental memorandum to further support his claims, pursuant to leave granted by this Court. (Dkt. 7.)[1]

Mr. Harris fundamentally is not guilty of any crime. While he pled guilty to a violation of 18 U.S.C. § 1001 based on alleged false statements on his customs form, as set forth in his Motion, Mr. Harris in fact did not intentionally make any false statements. Moreover, as the government has recently conceded, a § 1001 charge requires knowledge that making a false statement was unlawful. Mr. Harris was neither advised of this requirement, nor did he in fact possess such knowledge of illegality at the time he filled out his customs form.

As Mr. Harris alleges in his Motion, his guilty plea resulted, not from an informed judgment by Mr. Harris judgment that he was in fact guilty, but rather from ineffective assistance of counsel and coercive pressures leaving Mr. Harris feeling he had no choice but to enter a guilty plea. In addition to failing to advise Mr. Harris of the essential elements of 18 U.S.C. § 1001, retained counsel ignored Mr. Harris's interests, instead pursuing their own agendas in what each

---

[1] This memorandum is intended only to supplement, not to supplant, the points Mr. Harris has made in his Motion, and any point made by Mr. Harris not specifically addressed in this supplemental memorandum should not be construed as a waiver or abandonment of any claim.

SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE UNDER 28 U.S.C. § 2255

saw as "free publicity" in this highly publicized matter and threatening Mr. Harris and his mother, taking advantage of Mr. Harris's already fragile and vulnerable mental state.

Finally, as alleged in Mr. Harris's Motion, Mr. Harris's guilty plea was infected by government misconduct. From the start, the government misstated the facts and presented Mr. Harris to this Court as well as to the public as a murderer, rapist, and terrorist. The unseemly media frenzy that ensued caused Mr. Harris immeasurable stress and made it impossible for him to make a rational decision to reject the plea offer and maintain his innocence. Had Mr. Harris been adequately advised and provided a fair opportunity to litigate his innocence in this Court from the start, Mr. Harris would not have entered a guilty plea which, on its face, did not support a conviction under 18 U.S.C. § 1001.

## II.     Factual and Procedural Background[2]

On October 5, 2012, Petitioner Yongda Harris had been travelling to Boston, Massachusetts from Japan due to the sudden death of his adoptive father.  The court record provides that when provided a customs declaration form, Mr. Harris listed only China as the country visited and stated that he had approximately $100 in goods purchased abroad.  (Ex. 3; CR 25 at p. 7.) Upon his re-entry to the United States at Los Angeles International Airport, Mr. Harris was stopped by an officer with Customs and Border Protection ("CBP"), which ultimately led to a secondary search of Mr. Harris.  (CR 1.)[3]  In that secondary search, the CBP searched his checked-in luggage, wherein they found various items they believed to be suspicious, leading to Mr. Harris's arrest.

The government filed a criminal complaint, charging him with transportation of a hazardous material, based on what the government claimed to be a "smoke grenade" found in Mr. Harris's luggage. (CR 1.) The government sought and obtained detention based on their claims that Mr. Harris was "dangerous." Aside from the government's short statement regarding the supposed "smoke grenade," the government based its argument that Mr. Harris was dangerous on

---

[2] Mr. Harris swore under penalty of perjury to the facts contained in his Motion. (*See* Dkt. 1.) Except as otherwise noted, this statement of facts is based on Mr. Harris's verified Motion and the pleadings and documents filed in this case.

[3] CR refers to Court Record in the underlying criminal matter, Case No. 12-cr-1085-CAS.

legal materials found on Mr. Harris's computer and in his luggage. Despite the facts that the items in his luggage were all permissible to have on an aircraft and that the materials on Mr. Harris's were all protected by the First Amendment, the government characterized Mr. Harris as someone who "has a strong interest in sexual violence against children," specifically "young girls" who carried "disturbing and unusual paraphernalia," described by the government as a "kidnap kit." (Ex. 2; 10/12/2012 RT 18-20.) Ultimately, the government implied Mr. Harris was one step shy of committing heinous crimes against young girls without any substantive foundation to support its contention.

Mr. Harris's arrest, and the government's statements about it, gave rise to a media frenzy. Indeed, *Time* reported: "It's not just the tangible objects found in Yongda Huang Harris's suitcase that are alarming authorities — it's the virtual items, too."[4] National media outlets wrongly stated that Mr. Harris had "pornographic videos and instructions on kidnapping people on his computer,"[5] that the "pornography [was] of a disturbing nature."[6] Outlet after outlet repeated the government's statements that Mr. Harris's "computer revealed a 'strong interest' in sexual violence against girls,"[7] and that the magistrate judge "ordered Harris detained after hearing arguments from a prosecutor who said authorities found material on his computer that showed a sexual interest in young girls and an inclination to violence against children."[8]

Directly after the arrest, Mr. Harris feverishly sought to obtain pre-trial release as he had done nothing wrong. From day one, detention was detrimental to Mr. Harris's mental, physical,

---

[4] Regina Wang, *Prosecutor: Man Carrying Arsenal of Weapons Had Murder Instructions on Computer*, TIME (Oct. 15, 2012), *available at* http://newsfeed.time.com/2012/10/15/prosecutor-man-carrying-arsenal-of-weapons-had-murder-instructions-on-computer/.
[5] *Id.*
[6] Jack Date and Jennifer Harrison, *Judge Orders LAX Smoke Grenade Traveler Yongda Huang Harris Held Without Bond*, ABC NEWS (Oct. 12, 2012), *available at* http://abcnews.go.com/US/judge-orders-lax-smoke-grenade-traveler-yongda-huang/story?id=17467458.
[7] Bart Jansen, *Judge orders passenger held in smoke-grenade case*, USA TODAY (Oct. 12, 2012), *available at* http://www.usatoday.com/story/news/nation/2012/10/12/passenger-smoke-grenade/1630269/.
[8] *Man who allegedly flew to LAX with grenade, body bags ordered held*, LA TIMES (Oct. 12, 2012), *available at* http://latimesblogs.latimes.com/lanow/2012/10/yongda-huang-harris-ordered-jailed.html.

and emotional state and his overall psyche, especially due to his "grief for the death of his father

[] and the media carnage harassing him and his mother." (Dkt. 1 at 6.) Further, as Mr. Harris

describes in his Motion, on the third day of his detention, a US Marshal "brutally beat" Mr. Harris

"without provocation" while he was in detention. (*Id.*) Such conditions "severely traumatized Mr.

Harris on top of his trauma and grief." (*Id.*) Mr. Harris's mother retained Attorney Garret

Weinreid "specifically to secure bail and remove Mr. Harris from a dangerous facility." (Dkt. 1 at

1.) As Mr. Harris explains, rather than "perform any work whatsoever," Attorney Weinreid failed

to meet with Mr. Harris after Mr. Harris's arrest and he "did not take any phone calls from Mr.

Harris." When Attorney Weinreid *finally* met with Mr. Harris, it was *after* he had been fired for

failing to represent Mr. Harris's interests at the early critical stages of his criminal matter: his

arrest and subsequent custody. (*Id.*)

Mr. Harris then retained Steven Seiden, who interviewed Mr. Harris while he remained in

custody after the filing of the criminal complaint. It has become apparent to Mr. Harris that after

the interview, Attorney Seiden "breached the attorney client privilege by disclosing the

confidential statements Mr. Harris made to Seiden to USA Melissa Mills and to the media,"

which "caus[ed] severe prejudice to Mr. Harris." (Dkt. 1 at 2.) Instead of representing Mr.

Harris's interests in the underlying criminal matter and "point[ing] out the illegality of Mr.

Harris's detention," Attorney Seiden "utilized his discussions with Mr. Harris for his own

advertisement and free media exposure." (*Id.*) Attorney Seiden was fired and Attorneys Jerod

Gunsberg and Michael Rosenstein were retained after Mr. Harris's detention hearing.

Shortly thereafter, the criminal complaint filed against him was dismissed and the grand

jury returned a single-count indictment on November 8, 2012, charging Mr. Harris with making

false statements in violation of section 1001 of title 18 of the United States Code. (CR 15, 18, 24

[Ex. 1].) Specifically, Mr. Harris was charged with making false statements on his customs

declaration form in relation to his return in the United States, namely failing to include Japan

among the countries visited (even though that fact was obvious, since his flight originated in

Japan), and that he was bringing goods in with a value of $100 when in fact they were worth

SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO
VACATE, SET ASIDE OR CORRECT SENTENCE UNDER 28 U.S.C. § 2255

1  between $500 and $1000. With the criminal complaint dismissed and Mr. Harris being charged

2  with a non-violent and very minor crime, Mr. Harris expected trial counsel to seek his release as

3  his continued incarceration was chipping away at his sanity. However, Attorneys Gunsberg and

4  Rosenstein did not seek pre-trial release. Instead, Mr. Harris recalls that they inaccurately "told

5  Mr. Harris on multiple jail visits that [they] cannot 'appeal the Magistrate (Paul Abrams) denial

6  of your bail without new evidence.'" (Dkt. 1 at 2.) Nevertheless, aware of Mr. Harris's vulnerable

7  and susceptible state, Attorneys Gunsberg and Rosenstein repeatedly promised "bail and physical

8  safety out of prison," only if Mr. Harris a) paid counsel more money, b) participated in a proffer

9  session and c) pleaded guilty to the § 1001 charge. (*See* Dkt. 1 at 2-4, 6-7.)[9]

10      At the same time, notwithstanding that Mr. Harris was charged with nothing more than

11  making two minor false statements on his customs declaration, the government never retracted its

12  inflammatory statements that Mr. Harris was a "dangerous" individual.  The government began to

13  investigate Mr. Harris after his arrest at LAX, yet the Government never produced any evidence

14  to substantiate their claims regarding Mr. Harris. Nor did the government ever disclose to the

15  defense the results of their investigation in Japan. (Dkt. 1 at 5.) Mr. Harris is confident that any

16  investigation into his activities in Japan would have reflected no criminal conduct whatsoever and

17  would have demonstrated his innocence of the false accusations by the Government of "rape,

18  murder, and kidnap." (*Id.*) However, rather than disclosing this information to the defense or the

19  court, the Government continued to demonize Mr. Harris in the media and before this Court as a

20  "dangerous" individual who possessed a "kidnap kit." (Ex. 2; 10/12/2012 RT 19.)

21      By the time Attorneys Gunsberg and Rosenstein presented the plea agreement to Mr.

22  Harris he was still stunned by the Government's unsubstantiated accusations and was ultimately

23  forced to accept the terms against his will. As Mr. Harris explains, "On the night in December

24  2012 when Mr. Harris had been informed by Gunsberg and Rosenstein of the 'plea' he was never

25  given any voluntary chance to say 'no'." (Dkt. 1 at 6.) In fact, Mr. Harris had specifically told

26

27  [9] Attorneys Gunsberg and Rosenstein did move for release *only after* Mr. Harris pleaded guilty
    pursuant to a plea agreement in which the parties agreed to propose a sentence of five years'
28  probation.

SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO
VACATE, SET ASIDE OR CORRECT SENTENCE UNDER 28 U.S.C. § 2255

counsel "that he had no intention to lie or state any untruth facts on the Customs Declaration Form." (Dkt. 1 at 8.) Mr. Harris explained to counsel why he made the statements on the form, why he believed them to be truthful, and that any omission was unintentional. (*See* Dkt. 1 at 8-9.) Nevertheless, Mr. Harris recalls that "these attorneys started screaming and threatening Mr. Harris to sign the deal or they would quit on the spot," and that if Mr. Harris went to trial "he would be convicted." (*Id.*) Fearful that his counsel would "quit on the spot" and terrified of his continued incarceration, Mr. Harris acceded to his attorneys' demands. (Dkt. 1 at 6-7.)

On December 12, 2012, Mr. Harris and the government entered into a plea agreement whereby Mr. Harris would plead guilty to the single charge of making false statements in exchange for the government's request of a sentence of five years' probation subject to a number of conditions. (Ex. 3; CR 25, at pp. 3-5.) The plea agreement set forth the nature of the offense as follows:

> Defendant understands that for defendant to be guilty of the crime charged in the indictment, that is, making false statements, in violation of Title 18, United States Code, Section 1001, the following must be true: 1) defendant made a false statement in a matter within the jurisdiction of the U.S. Customs and Border Protection ("CBP"); 2) defendant acted willfully; that is deliberately and with knowledge that the statement was untrue; and 3) the statement was material to CBP's activities and decisions, that is, it had a natural tendency to influence, and was capable of influencing, the agency's decisions or activities.

(Ex. 3; CR 25, at p. 5.)

The factual basis in the plea agreement stated in full:

> On October 5, 2012, the defendant arrived in Los Angeles International Airport from Japan. On defendant's customs declaration form, in response to a question about "countries visited on this trip prior to U.S. arrival, the defendant stated that he had visited China. In fact, defendant spent approximately 14 days in Japan during this trip. Additionally, the defendant stated on the customs declaration form that he was bringing $100 in goods purchased abroad into the United States. However, the defendant's luggage actually contained between $500 and $1,000 in goods purchased abroad during the overseas trip.

> Both false statements related to a matter within the jurisdiction of CBP, and they were material to CBP's activities and decisions. The defendant's false statements were willful.

(Ex. 3; CR 25, at pp. 7-8.)

1    The change of plea hearing occurred on December 17, 2012. At that hearing, Mr. Harris

2    was disoriented. When asked by the Court "Can you tell me what you understand to be the reason

3    for your court appearance today?" Mr. Harris replied, "I believe it's a bail hearing." (Ex. 4;

4    12/17/2012 RT 5.) He then realized it was the change of plea hearing. (*Id.*) The Court did ask Mr.

5    Harris if "anyone threatened [him], coerced [him] or anyone close to [him] or forced [him] to

6    plead guilty?" (Ex. 4; 12/17/2012 RT 17.) Having been told by Attorneys Gunsberg and

7    Rosenstein that pleading guilty was his only option in securing his release, Mr. Harris responded,

8    "No, Your Honor," (*id.*), even though Attorneys Gunsberg and Rosenstein in fact threatened Mr.

9    Harris with their withdrawal and told him that he would "be 'raped and murdered in prison' if he

10   dared to reject the plea deal," (dkt. 1 at 7).

11       During the change of plea hearing, the Court directed the government "to state in

12   summary form the salient terms of the plea agreement." (Ex. 4; 12/17/12 RT 6.) The government

13   responded, "The defendant is entering a guilty plea to 18 United States Code 1001." (*Id.*) The

14   Court then asked the government to "state for the record what the government would be required

15   to prove beyond a reasonable doubt for the defendant to be found guilty of the charge." (Ex. 4;

16   12/17/12 RT 10.) The government stated:

17        If this case were to proceed to trial the government would be required to prove beyond a
18        reasonable doubt: First, the defendant made a false statement . . . in a matter within the
          jurisdiction of the United States Custom and Border Protection. And second, that
19        defendant acted willfully, that is deliberately and with knowledge that the statement was
          untrue.  And third, that the statement was material to the Customs and Border Protections
20        activities or decisions, that is it had a natural tendency to influence or was capable of
          influencing the agency's decisions or activities.
21
22   (Ex. 4; 12/17/12 RT 10-11.)

23       The factual basis for the guilty plea, as stated by the government was that:

24        The government would prove that on October 5, 2012, defendant came
          through Los Angeles International Airport from Japan. He filled out a customs
25        declaration form, and in response to a question about countries that he had visited
          on his trip prior to his arrival in the United States, he stated that he had visited
26        China. In fact defendant had visited Japan for 14 days on that trip.
               And additionally, defendant stated on that customs and declaration form
27        that he was bringing in $100 in goods purchased on that trip.  However, his

28

7

luggage actually contained between 500 and $1,000 in goods purchased abroad during that trip.

     Both false statements related to a matter within the jurisdiction of Custom and Border Protection and they were material to the CBP's activities and decisions.  In addition, they were willful.

(Ex. 4; 12/17/12 RT 16-17.)

     At the end of the plea colloquy, the Court found that Mr. Harris's "plea is freely and voluntarily made," that he "fully understands the charges against him and the potential penalties" and "understands his constitutional and statutory rights and wishes to give them up." (Ex. 4; 12/17/12 RT 19.)  The district court also found that Mr. Harris "is fully competent to enter a plea and stand trial at this time, and finally the Court finds there is a factual basis for the guilty plea." (*Id.*)  The Court then accepted Mr. Harris's change of plea from not guilty to guilty and set a date for sentencing.  (*Id.*)  Two days later, the Court ordered Mr. Harris's release, but Mr. Harris remained in custody until January 29, 2013, when he was released on bond.  (CR 27, 30, 31.)

     Due to the representation Mr. Harris received from Attorneys Gunsberg and Rosenstein, he asked the Court to remove them as his counsel. (3/21/2013 RT 4.) William Cintolo was then retained. At this point, Mr. Harris "had no intention of keeping his guilty plea." (Dkt. 1 at 7.) Even so, Attorney Cintolo told the Court, "We're not looking to withdraw the guilty plea or anything of that nature," (3/21/2013 RT 6), even though that was contrary to Mr. Harris's wishes. (Dkt. 1 at 7.) Mr. Harris was not aware that Mr. Cintolo would make such an assertion to the Court and instead "was going to tell the Court to allow him to withdraw the plea under forced coercion and threats from Mr. Gunsberg and Mr. Rosenstein," but he was unable to do so due to his being placed back into custody. (*Id.*) Mr. Harris was ultimately sentenced to a term of probation for five years, including various special conditions relating to sex offenses and contact with children.

     Mr. Harris appealed his conviction and sentence. During the pendency of Mr. Harris's appeal, Mr. Harris submitted a letter to the Court on December 30, 2014. In that letter, Mr. Harris informed the Court that he was innocent of the crime of which he was convicted, and that his change of plea to guilty was involuntary and only due to Attorneys Gunsberg and Rosenstein's "gross and severe violations of their duty to their client," claiming that he received ineffective

8

1   assistance of counsel on the very facts alleged in his petition. (Ex. 8; *See* CR 117.) The Court

2   concluded that it did not have jurisdiction to hear the matter raised in the letter because Mr.

3   Harris's appeal was pending in the Ninth Circuit. The Court decided to "keep the letter in the file"

4   and "take no action at this time until the appeal is resolved." (2/5/14 RT 6.)

5         On August 12, 2015, the Ninth Circuit affirmed Mr. Harris's conviction and remanded in

6   part as to Mr. Harris's sentence. The issues raised on appeal relevant here concerned whether his

7   entry into the plea agreement was voluntary and whether the Court imposed an illegal sentence.

8   He first argued that his conviction must be reversed because the Court had failed to accurately

9   advise him of the charge of making false statements in violation of 18 U.S.C. § 1001 and to find a

10  sufficient factual basis for the plea, rendering Mr. Harris's plea involuntary. Specifically, Mr.

11  Harris argued that he was not properly advised that a § 1001 charge requires proof that the

12  defendant knew that making the allegedly false statements constituted a crime, and the factual

13  basis for the plea failed to establish that requisite knowledge. (Ex. 9; AOB 23-37.) Mr. Harris also

14  made several challenges to his sentence. (Ex. 9; AOB 37-51.)

15        In affirming Mr. Harris's conviction, the Ninth Circuit found that Mr. Harris failed to

16  show plain error with respect to his guilty plea, based on the record available on direct appeal,

17  and that his five-year probationary sentence was legal. The Ninth Circuit recognized that Mr.

18  Harris had not been "specifically advised that the government was also required to prove that he

19  knew that making a knowing and deliberately false customs declaration is illegal," but concluded

20  that "[e]ven assuming that Harris should have been advised that the government had to prove that

21  he knew that willfully making a false statement is a crime," Mr. Harris suffered no prejudice

22  because he was "represented by counsel," so "[t]here was no reason to believe that Harris … did

23  not know that it is a crime to make a false statement." (Ex. 11; Mem. Dispo. 2-3.) The Ninth

24  Circuit also rejected Mr. Harris's claim that the length of his sentence was illegal, but did reverse

25  and remand to narrow one of the conditions of his probation found to be impermissibly vague.[10]

26

27  _____

28  [10] This Court resolved the remand in October, 2015, by amending the judgment to include a
    modified condition of probation.

SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO
VACATE, SET ASIDE OR CORRECT SENTENCE UNDER 28 U.S.C. § 2255

III.        **Argument**

    A.        Legal Standard

A movant "filing a claim for federal habeas relief under 28 U.S.C. § 2255 is entitled to an evidentiary hearing '[u]nless the motion and the files and records of the case conclusively show that the [petitioner] is entitled to no relief.'" *United States v. Leonti*, 326 F.3d 1111, 1116 (9th Cir. 2003) (quoting 28 U.S.C. § 2255). Mr. Harris's allegations must be taken as true "unless palpably incredible or patently frivolous." *Id.* at 1114 (citing *United States v. Schaflander*, 743 F.2d 714, 717 (9th Cir. 1984)). "The standard essentially is whether the movant has made specific factual allegations that, if true, state a claim on which relief could be granted." *Schaflander*, 743 F.2d at 717 (citing *United States v. Hearst*, 638 F.2d 1190, 1194 (9th Cir. 1980)).

    B.        Mr. Harris Was Deprived of Due Process and Various Constitutional Rights Due to His Misadvisement and Involuntary Guilty Plea

        1.        Mr. Harris's Guilty Plea Was Involuntary and Unsupported by a Sufficient Factual Basis in Light of the Failure to Advise Him of the Essential Element of § 1001 that He Know that His Statements Were Unlawful

A guilty plea may be overturned on collateral review upon a showing that the Rule 11 proceeding was "'inconsistent with the rudimentary demands of fair procedure' or constituted a 'complete miscarriage of justice.'" *United States v. Vonn*, 535 U.S. 55, 64 (2002) (quoting *United States v. Timmreck*, 441 U.S. 780, 783 (1979)); *see also United States v. Grewal*, 825 F.2d 220, 222 (9th Cir. 1987) ("For a section 2255 movant to successfully challenge a guilty plea based upon a violation of Rule 11, he must establish that the violation amounted to a jurisdictional or constitutional error or that the violation resulted in a complete miscarriage of justice or in a proceeding inconsistent with the demands of fair procedure." (citing *Timmreck*, 441 U.S. at 783-84; *United States v. Rivera-Ramirez*, 715 F.2d 453, 456 (9th Cir. 1983)).

Understandably, a technical violation alone will not support a collateral attack of a conviction per a plea agreement, "[f]or the concern with finality served by the limitation on collateral attack has special force with respect to convictions based on guilty pleas." *Timmreck*, 441 U.S. at 784. However, a guilty plea that is unsupported by a sufficient factual basis is void as

a matter of law and is subject to challenge on this basis pursuant to 28 U.S.C. § 2255. *United States v. Barron,* 172 F.3d 1153, 1158 (9th Cir. 1999) (en banc) (guilty plea under 18 U.S.C. § 924(c) properly vacated under § 2255 where factual basis inadequate based on change in law); *see also id.* at 1161 ("The statute incorporates the fundamental principle that it is never just to punish a man or woman for an innocent act."). Moreover, an involuntary guilty plea violates the basic principles of due process. *See, e.g., United States v. Villalobos*, 333 F.3d 1070, 1073 (9th Cir. 2003).

The defendant's right to be informed of the charges against him exists to ensure that guilty pleas are knowing and voluntary. *United States v. Pena*, 314 F.3d 1152, 1157 (9th Cir. 2003). A plea cannot be "voluntary in the sense that it constitute[s] an intelligent admission that [a defendant] committed the offense unless the defendant receive[s] 'real notice of the true nature of the charge against him, the first and most universally recognized requirement of due process.'" *Henderson v. Morgan*, 426 U.S. 637, 645 & n.13 (1976); *see also Villalobos*, 333 F.3d at 1073 ("due process requires that the defendant be informed of the 'critical' elements of the offense'" in order to intelligently and voluntarily plead guilty (quoting *United States v. Minore*, 292 F.3d 1109, 1115 (9th Cr. 2002)). Thus, "a guilty plea cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts." *United States v. Portillo-Cano*, 192 F.3d 1246, 1251 (9th Cir. 1999). In the absence of proper advisement, "[Mr. Harris] could not properly evaluate the risks of entering the plea agreement, and [thus] could not intelligently and voluntarily plead guilty, [as] he was misinformed about … a critical element of his offense and was therefore unaware of the true nature of the charge against him." *Villalobos*, 333 F.3d at 1075; *see also McCarthy v. United States*, 394 U.S. 459 (1969).

At the time of Mr. Harris's guilty plea, Ninth Circuit case law had made clear that "[i]n the context of false statement crimes [] willfulness simply means 'deliberately and with knowledge,' and does not require knowledge of unlawfulness." *United States v. Ajoku*, 718 F.3d 882, 889 (9th Cir. 2013) (citing cases), *cert. granted, judgment vacated*, 134 S. Ct. 1872 (2014); *see also United States v. Heuer*, 4 F.3d 723, 732 (9th Cir. 1993). During the pendency of Mr.

11

SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE UNDER 28 U.S.C. § 2255

1   Harris's direct appeal, however, the government conceded that willfully making a false statement

2   pursuant to 18 U.S.C. § 1035 (which is worded identically to §1001) requires not only knowledge

3   that the statement is false but also knowledge of the unlawfulness of making the statement.

4   Specifically, in responding to the defendant's petition for certiorari in *Ajoku*, the Solicitor General

5   conceded the defendant-petitioner's position that the willfulness element should conform to

6   *Bryan v. United States*, 524 U.S. 184 (1998) and include that the defendant not only act

7   deliberately and with knowledge that the statement is untrue, but that defendant also have

8   knowledge that the conduct was unlawful. (The Solicitor General's brief is attached as Exhibit

9   10.) The Solicitor General stated, "Although Ninth Circuit precedent supported the position the

10  government took below, the government now agrees that the general criminal-law interpretation

11  of 'willfully' articulated in *Bryan* should govern in the context of Section[] 1001." (Ex. 10; S.G.

12  Brief at 13.) Thus, § 1001 "should be interpreted to require proof that the defendant knew his

13  conduct was unlawful." (Ex. 10; S.G. Brief at 15.) The Supreme Court remanded, *Ajoku v. United*

14  *States*, 134 S. Ct. 1872 (2014), and the Ninth Circuit reversed the defendant's conviction based on

15  the government's concession, *United States v. Ajoku*, 484 Fed. Appx. 824 (9th Cir. 2014)

16  (unpublished). In light of this significant development, the Ninth Circuit's Model Criminal Jury

17  Instruction for making false statements in violation of § 1001 was revised to conform to *Bryan*'s

18  definition of willfulness – that the defendant have knowledge that his conduct was unlawful.

19  Ninth Cir. Crim. Jury Instr. 8.73; see also Ninth Cir. Crim. Jury Instr. 5.5.

20          The new rule for the willfulness element of § 1001 applies to Mr. Harris even though it

21  was not in effect during the Court's proceedings because "a 'new rule for the conduct of criminal

22  prosecutions is to be applied retroactively to all cases ... pending on direct review …, with no

23  exception for cases in which the new rule constitutes a 'clear break' with the past.'" *Johnson v.*

24  *United States*, 520 U.S. 461, 467 (1997) (quoting *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987)).

25  The change of law dramatically undermined not only the Court's advisement of law to Mr. Harris,

26  but also the factual basis, on which the plea agreement depends since the factual basis makes no

27

28

mention that Mr. Harris knew it was a crime to make the purported false statements on the customs declaration form.

On direct appeal, the Ninth Circuit recognized that Mr. Harris "was not specifically advised that the government was also required to prove that he knew that making a knowing and deliberately false customs declaration is illegal." (Ex. 11; Mem. Dispo. 2.) The Ninth Circuit nonetheless concluded that Mr. Harris could not establish prejudice under the plain error standard because he was "represented by counsel," so "[t]here was no reason to believe that Harris … did not know that it is a crime to make a false statement." (Ex. 11; Mem. Dispo 2-3.)

The Ninth Circuit's decision was based on the limited record before it, as it must be pursuant to the rules of appellate procedure. However, on collateral review, it is appropriate to consider evidence outside the original record of proceedings to determine whether relief is warranted. In Mr. Harris's Motion, Mr. Harris has set forth facts demonstrating that, in fact, there was every reason to believe that Mr. Harris did not know he was committing a crime when he filled out his customs declaration. Mr. Harris of course was not represented by counsel at the time he filled out the customs form. And while he was represented by counsel at the time of his guilty plea, he was not advised by counsel that he needed to have been aware of the illegality of his statements on his customs declaration in order to be guilty of violating §1001. (dkt. 1 at 8-9.) In fact, Mr. Harris made known to his then-counsel that he did not even believe his statements on his customs declaration were false, much less that he knew his statements were unlawful. (dkt. 1 at 8-9.) And as discussed more fully below, Mr. Harris agreed to plead guilty – not because he was properly advised of the elements of §1001 and not because he actually believed himself to be guilty of violating §1001 – but because he was in a fragile mental state and was misled and coerced into pleading guilty by the actions of the government and his own counsel.

Mr. Harris maintains his innocence and that he did not intend to make any false statements on the customs declaration form. At most the record establishes that Mr. Harris professed that he made a "false statement in a matter within the jurisdiction of the United States Custom and Border Protection" and that was "deliberate[] and with knowledge that the statement was untrue."

13

(Ex. 4; 12/17/2013 RT 10.) Mr. Harris did not profess that he had done so knowing it to be unlawful, which is required under current law. Moreover, Mr. Harris has repeatedly professed his innocence, including in a letter to the Court in December 2014. (Ex. 8.) This alone is grounds to vacate Mr. Harris's conviction and sentence.

2.   Mr. Harris's Guilty Plea Was Involuntary for the Additional Reasons that He Was Coerced and Was in a Compromised Mental State

As Mr. Harris states in his Motion, at the time of his guilty plea, he was in no mental state to make a voluntary and intelligent decision whether to enter a guilty plea. At the time of his arrest, Mr. Harris was already in a fragile mental state because he was grieving the loss of his father. In fact, his return to the United States was to attend his father's funeral in Boston, a trip he was not able to complete due to his detention in Los Angeles. (dkt. 1 at 16.)

Due to the government's mischaracterization of the evidence and demonization of Mr. Harris (discussed in Section D below), he was improperly held in custody. Mr. Harris's time spent in custody traumatized him, both mentally and physically. (*See* dkt. 1 at 5-6, 7, 10-11.) On top of that, the media frenzy that surrounded Mr. Harris's arrest and detention caused Mr. Harris great emotional distress. (dkt. 1 at 6.) Mr. Harris was smeared in the press as a rapist and murderer, with a special interest in doing harm to children, as well as an anarchist and possible terrorist. It is difficult to imagine more damning accusations, and Mr. Harris felt deeply humiliated for both himself and his family.

In these desperate times, Mr. Harris's then-counsel gave Mr. Harris no practical choice but to plead guilty (discussed in Section C below). As Mr. Harris explains in his Motion, Attorneys Gunsberg and Rosenstein made no effort to secure his pre-trial release or to assist him with the threats to his personal safety he experienced while incarcerated. Instead, Mr. Harris recalls that the attorneys threatened him that he would be raped and murdered in prison and the only way to secure his release and physical safety was to plead guilty to the § 1001 charge. (*See* Dkt. 1 at 2-4, 6-7.) Ultimately, Mr. Harris recalls a heated conversation the night before entry of the guilty plea in which his counsel screamed and threatened to "quit on the spot" if Mr. Harris

did not accept the plea offer. Terrified of his continued incarceration and the possibility of facing abuse in prison, Mr. Harris felt he had no choice but to plead guilty and to inform the Court that he was doing so "voluntarily." (Dkt. 1 at 6-7.) However, a plea made under such circumstances cannot be considered in any way "voluntary."

Mr. Harris underwent psychological evaluations in connection with his underlying criminal case. However, the psychiatric experts were not asked to opine on whether Mr. Harris's mental state at the time allowed him to make a rational and intelligent decision whether to plead guilty. Mr. Harris therefore would ask for the appointment of Dr. Nathan Lavid, one of the professionals who previously evaluated Mr. Harris, to evaluate the impact of Mr. Harris's mental state on his ability to make a voluntary and intelligent choice to plead guilty. Mr. Harris believes this information will be of assistance to the Court in determining the issue of the voluntariness of his guilty plea.

C.     Mr. Harris's Conviction Should Also Be Reversed Due to the Ineffective Assistance of Counsel

The actions of Mr. Harris's attorneys, from his arrest and immediate detention to his plea agreement and sentencing proceedings, deprived Mr. Harris of his Sixth Amendment right to effective assistance of counsel. The right to effective assistance of counsel applies whether counsel is retained or appointed, *Cuyler v. Sullivan*, 446 U.S. 335, 342-45 (1980), and "applies to all 'critical stage[s] of the prosecution,'" *United States v. Leonti*, 326 F.3d 1111, 1116 (9th Cir. 2003) (quoting *Kirby v. Illinois*, 406 U.S. 682, 690 (1972)).  Indeed, "defendants are entitled to competent counsel 'at every stage of a criminal proceeding where substantial rights . . . may be affected.'" *Id.* (quoting *Mempa v. Rhay*, 389 U.S. 128, 134 (1967); citing *United States v. Ant*, 882 F.2d 1389, 1393 (9th Cir. 1989)). "[T]his guarantee thus encompasses counsel's assistance whenever necessary to assure a meaningful 'defence.'" *United States v. Wade*, 388 U.S. 218, 224 (1967) (quoting U.S. Const. amend. VI). The Ninth Circuit has explained that "the essence of a 'critical stage' is not its formal resemblance to a trial, but the adversary nature of the proceeding, combined with the possibility that a defendant will be prejudiced in some significant way by the

15

SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE UNDER 28 U.S.C. § 2255

absence of counsel.'" *United States v. Yamashiro*, 788 F.3d 1231, 1235 (9th Cir. 2015) (quoting *Leonti*, 326 F.3d at 1117).

"To prevail on his ineffective assistance claim, [a movant] must show that (1) his attorney's performance was unreasonable under prevailing professional standards, and (2) there is a 'reasonable probability that but for counsel's unprofessional errors, the result would have been different.'" *Leonti*, 326 F.3d at 1120 (quoting *Strickland v. Washington*, 466 U.S. 668, 687-91, 694 (1984).) "A 'reasonable probability' is 'a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). This burden is not an onerous one and Mr. Harris need *not* show that his attorneys' deficient performance "more likely than not altered the outcome of the case." *Sanders v. Ratelle*, 21 F.3d 1446, 1461 (9th Cir. 1994) (citing *Strickland*, 466 U.S. at 693).

      1.   <u>Counsel's Ineffective Assistance in the Plea Process Deprived Mr. Harris of His Rights Under the Sixth Amendment</u>

A criminal defendant is entitled to the effective assistance of counsel in determining whether to plead guilty. *See, e.g., Hill v. Lockhart*, 474 U.S. 52 (1985); *see also Leonti*, 326 F.3d at 1117 (A defendant is "entitled to the effective assistance of counsel in his decision whether and when to plead guilty."). The Ninth Circuit has "found ineffective assistance of counsel in cases where an attorney's failures concerned the process of plea bargaining and reaching the plea agreement." *Leonti*, 326 F.3d at 1117 (discussing cases). Accordingly, Mr. Harris states a claim under the Sixth Amendment if Attorneys Gunsberg and Rosenstein's conduct "was 'outside the wide range of professionally competent assistance.'" *Id.* (quoting *Strickland*, 466 U.S. at 690).

      a.   <u>Mr. Harris's Counsel Failed to Adequately Advise Him of the Charged Offense</u>

Mr. Harris of course could not make any showing on appeal that he had received ineffective assistance of counsel because the record was not nor could it be fully developed on direct appeal. *See Sitton*, 968 F.2d at 961 ("Ineffective assistance claims are ordinarily reviewed only in collateral proceedings because such claims usually cannot be resolved without the

development of facts outside the original record."); *see also United States v. Jeronimo*, 398 F.3d 1149, 1156 (9th Cir. 2005) (The Ninth Circuit "will not remand a case from direct appeal for fact-finding related to an ineffective assistance of counsel claim, but will allow a defendant to pursue the issue in district court collateral proceedings." (quotation omitted)). But in his Motion, Mr. Harris has now attested to the fact that Attorneys Gunsberg and Rosenstein did not advise him of "the law in relation to the facts," specifically that Mr. Harris know that it is a crime to make a false statement, when they presented him the proposed plea agreement. Indeed, no one informed Mr. Harris that he must have knowledge that it is a crime to make false statements in violation of 18 U.S.C. § 1001.

        b.    <u>Mr. Harris's Counsel Did Not Seek Pre-Trial Release or Properly Advise Mr. Harris of His Options for Pre-Trial Release</u>

Between the time of Mr. Harris's initial detention hearing and his guilty plea, his counsel made no effort to secure his pre-trial release. Further, Mr. Harris recalls that they misadvised him that he could not seek review of the magistrate judge's detention order without having new evidence. (dkt. 1 at 2.) This advice was erroneous, as Mr. Harris had the right to seek review of the magistrate's detention ruling, without a showing of new evidence. *See* 28 U.S.C. § 636(b)(1)(A) ("A judge of the court may reconsider any pretrial matter under this subparagraph (A) where it has been shown that the magistrate's [magistrate judge's] order is clearly erroneous or contrary to law."); Fed. R. Civ. P. 72 (requiring district judges to consider timely objections to magistrate judge rulings and "modify or set aside any part of the order that is clearly erroneous or is contrary to law"); L.R. 72-2.1 (allowing for motion for review of magistrate judge's ruling to be filed with district judge within 14 days). Seeking review of the magistrate judge's detention order was not only possible but would have been particularly appropriate here, where Mr. Harris was ultimately only charged with a minor non-violent § 1001 violation based on alleged misstatements on Mr. Harris's customs declaration. Instead, counsel waited until *after* Mr. Harris entered his guilty plea to seek his release on bail.

As a result of Mr. Harris remaining in custody prior to his plea, Mr. Harris's ability to

make a voluntary and intelligent choice regarding whether to enter a guilty plea was compromised. As discussed in his Motion, Mr. Harris was desperate to secure his release from custody given the physical and psychological trauma he suffered while in pretrial detention. Because he was misinformed that he had no ability to seek pre-trial release absent a guilty plea, Mr. Harris saw no alternative except to enter his guilty plea.

2.   Mr. Harris's Motion Establishes that His Counsel Operated Under a Conflict of Interest, Abandoning Their Duty of Loyalty and Violating Client Confidentiality

As set forth in Mr. Harris's Motion, Attorneys Gunsberg and Rosenstein's conduct also reflected a conflict of interest. While "the Sixth Amendment right to counsel … does not guarantee 'a right to counsel with whom the accused has a 'meaningful attorney-client relationship,'" *Frazer v. United States*, 18 F.3d 778, 783 (9th Cir. 1994) (quoting *Morris v. Slappy*, 461 U.S. 1, 3-4 (1983)), defense counsel unequivocally owes a duty of loyalty, *id.* at 782. "A defense attorney who abandons his duty of loyalty to his client and effectively joins the state in an effort to attain a conviction … suffers from an obvious conflict of interest." *Id.* (quotations omitted). "Such an attorney, like unwanted counsel, ''represents' the defendant only through a tenuous and unacceptable legal fiction.'" *Id*. The Ninth Circuit expressed: "In fact, an attorney who is burdened by a conflict between his client's interests and his own sympathies to the prosecution's position is considerably worse than an attorney with loyalty to other defendants, because the interests of the state and the defendant are necessarily in opposition." *Id.* "[A] defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." *Cuyler*, 446 U.S. at 349-50.

As alleged, Attorneys Gunsberg and Rosenstein suffered from an obvious conflict of interest as they refused their loyalty to their client, Mr. Harris, and instead assisted the government. Mr. Harris maintains they failed to adequately advise him on the sole charge against him, discussed above, and "breached attorney client confidentiality by disclosing to the prosecutor a fact known only by them and the defendant." (Dkt. 1 at 3.) In one example, they

18

"disclosed the confidential information regarding internet used by Mr. Harris to the Prosecutor to assist in prosecuting and investigating Mr. Harris." (*Id.*) They intentionally refused to investigate Mr. Harris's claims of innocence. (*Id.*) And when they presented Mr. Harris the proposed plea agreement, "they started screaming and threatening Mr. Harris to sign the deal or they would quit on the spot." (Dkt. 1 at 6-7.) Under such circumstances, Mr. Harris was denied the duty of loyalty owed from attorney to client, a per se denial of his Sixth Amendment right to effective assistance of counsel.

D.    The Government's Misconduct Also Requires Vacating Mr. Harris's Conviction

The prosecutorial misconduct alleged in Mr. Harris's Motion undermined Mr. Harris's fundamental guarantee to fair and impartial criminal proceedings. *See Vonn*, 535 U.S. 55, 64 (2002) (quoting *Timmreck*, 441 U.S at 783) (collateral relief available where proceeding was "'inconsistent with the rudimentary demands of fair procedure' or constituted a 'complete miscarriage of justice.'"). Mr. Harris describes a criminal prosecution in which the government "describe[ed] Mr. Harris as a 'rapist, serial killer, murderer' or whatever other pejorative they [could] come up with without any criminal charge, conviction, or anything of substance or evidence they can produce to justify this." (Dkt. 1 at 15.)

Indeed, the government's misstatements began when it initially charged Mr. Harris in a criminal complaint with transportation of a hazardous material, based on what the government claimed to be a "smoke grenade" found in Mr. Harris's luggage. (CR 1.) In fact, as Mr. Harris explains, the item in Mr. Harris's luggage was not a "smoke grenade" at all but rather a harmless smoke canister with a wick like a candle. (dkt. 1 at 5-7.) Moreover, the item was expressly permitted to be carried in checked luggage aboard an aircraft. (*Id.*)

The government then secured Mr. Harris's pretrial detention based on its mischaracterization of Mr. Harris as someone who "has a strong interest in sexual violence against children," based on materials found on Mr. Harris's computer which was searched following his arrest. (10/12/2012 RT 18-20) The government's comments strongly suggested that Mr. Harris had violent child pornography on his computer. Indeed, in the ensuing media frenzy,

19

1    national media outlets relentlessly repeated the government's statements regarding Mr. Harris's

2    supposed "strong interest in violence against girls," and reported that he had disturbing

3    "pornography" on his computer. In fact, however, the government did not come forward with

4    evidence of any pornography, much less child pornography, on Mr. Harris's computer. Rather, as

5    Mr. Harris explains, the supposedly "disturbing" materials he had downloaded on his computer

6    were Japanese anime, which is not actionable child pornography. (dkt. 1 at 12-13.) The materials

7    on Mr. Harris's computer were not criminal but were speech protected by the First Amendment

8        Indeed, tellingly, the government never charged Mr. Harris with any crimes related to the

9    contents of his computer or the contents of his luggage. Nor could the government have filed any

10   such charges because the contents were not illegal. Moreover, the government conducted an

11   investigation immediately after his arrest, including regarding Mr. Harris's conduct in Japan. Yet,

12   the government did not uncover any illegal conduct as part of that investigation either. The

13   prosecutor's own admissions reflect their awareness that they lacked evidence of criminality. As

14   described in Mr. Harris's Motion, AUSA Melissa Mills reportedly admitted to Mr. Harris's

15   attorneys that the case was "bizarre" and "there [was] so little evidence" establishing a crime.

16   (dkt. 1 at 5.)

17       Despite its awareness of the lack of evidence of criminal conduct, the government never

18   corrected its statements to the Court or the media. The government's prejudicial characterizations

19   precluded any meaningful representation as his counsel, based on the characterizations, believed

20   him to be "'an animal' who would act violently from what they saw of him in the media." (Dkt. 1

21   at 7.) In the end, Mr. Harris's criminal proceedings "had been utterly corrupted by press

22   coverage." *See Murphy v. Florida*, 421 U.S. 794, 798 (1975) (discussing cases in which criminal

23   defendants' cases were overturned due to pretrial publicity that infected the fairness of trial).

24       Nor did the government make any disclosures to the defense regarding exculpatory

25   information learned as part of its investigation pursuant to its *Brady* obligations. Instead, the

26   government trumped up a face-saving, but factually inadequate, §1001 charge to ensure it could

27   continue Mr. Harris's prosecution and detention in the absence of any evidence of the actual

28

20

SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO
VACATE, SET ASIDE OR CORRECT SENTENCE UNDER 28 U.S.C. § 2255

commission of a crime. Had the government corrected its misstatements, or at least disclosed exculpatory information to the defense, and had Mr. Harris's counsel provided effective assistance of counsel, Mr. Harris likely would have been able to obtain pretrial release prior to entering his guilty plea. And without the intense vulnerability he faced while incarcerated, Mr. Harris would have been able to make a voluntary and intelligent choice regarding his guilty plea and, as he asserts in his Motion, would not have entered his guilty plea but would have challenged the charge against him at trial.

The government may believe the ends justify the means, and because they purportedly had suspicions about Mr. Harris, they were justified in securing a conviction – any conviction – at all cost. While it may be legitimate for law enforcement to follow leads and conduct further investigation based on evidence it finds suspicious, it is not legitimate to misuse the criminal process to such ends. Criminal prosecution requires not mere unsubstantiated suspicion of some potential for criminality, but proof beyond a reasonable doubt that the individual has actually committed a crime. Based on the government's conjecture and reported desire to keep Mr. Harris under supervision, Mr. Harris has a felony criminal record that will haunt him for the remainder of his life – even though he never committed any crime at all. Mr. Harris's involuntary and improperly induced guilty plea cannot be permitted to stand under these circumstances.

## IV.    Conclusion and Requested Relief

For all the foregoing reasons, Petitioner Yongda Harris respectfully requests this Court to grant the following relief:

1.   Grant an evidentiary hearing, as the sworn factual allegations in Mr. Harris's Motion give rise to relief pursuant to 28 U.S.C. § 2255;

2.   Appoint Dr. Nathan Lavid and authorize expenditure of CJA funds to perform an evaluation and provide expert testimony regarding Mr. Harris's mental state at the time he entered his guilty plea;

3.  Order the government to produce any exculpatory information not previously disclosed to the defense, as well as records of communications reflecting knowledge of the prosecutors as to the results of investigations involving Mr. Harris during the period between his arrest and guilty plea, and records of communications between Mr. Harris's counsel and the government; and

4.  Grant Mr. Harris's Motion to vacate his conviction and sentence pursuant to 28 U.S.C. §2255, for all the reasons set forth in Mr. Harris's Motion and this supplemental memorandum.

Dated:    October 24, 2016              JAMES & ASSOCIATES

                                        By:   /s/ Becky S. James
                                              BECKY S. JAMES
                                              *Attorney for Petitioner*
                                              YONGDA HARRIS

SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO
VACATE, SET ASIDE OR CORRECT SENTENCE UNDER 28 U.S.C. § 2255